The plaintiffs, Mr. and Mrs. McCaleb, were the owners of a commercial building in Fayette, Alabama, which they leased to the defendant, Fayette Fabricators, Inc. for $280 per month. The building was destroyed by fire in September, 1972. Fayette Fabricators manufactured bumpers to be used on motor vehicles.
The plaintiffs originally brought suit against the City of Fayette and various individual defendants, alleging that they were negligent in failing to utilize water which was under pressure at a nearby fire hydrant to extinguish the fire. Later the complaint was amended to strike the City of Fayette and the other individual defendants and to add Union Oil Company of California, Mackey Paint Mfg. Co., and American Mineral Spirits Company as defendants. The complaint charged that Fayette Fabricators negligently conducted the operation of its business by negligently placing a hot automobile bumper or causing sparks to be thrown into a flammable liquid solution, negligently causing the solution to catch fire, as a proximate result of which the plaintiffs' building was destroyed. Mackey Paint Mfg. Co. was charged with negligence in selling Xylol to the defendant Fayette Fabricators, since Mackey knew or should have known or should have determined by reasonable diligence that the Xylol would be used around operations which produced substantial heat and sparks. Union Oil and American Mineral Spirits were charged with negligence in marketing a flammable liquid when they knew or should have known that the product would be used in operations where there were sparks, thereby creating a safety hazard. Mackey, Union Oil and American Mineral were charged with negligence in failing to adequately warn ultimate users of the dangerous propensity of Xylol.
The case went to trial on these theories. At the conclusion of the evidence presented by all parties, the defendants, Mackey Paint Mfg. Co., Union Oil and American Mineral Spirits Company moved for a directed verdict in their favor on the ground that the plaintiffs had not produced any evidence of negligence on defendants' part. The court directed a verdict for these three defendants and submitted the case to the jury against Fayette Fabricators. The jury returned a verdict against Fayette Fabricators in favor of the plaintiffs in the amount of $25,000.
The plaintiffs appeal the judgment in favor of Mackey Paint Mfg. Co. On appeal, they concede that they "are unable to make out a prima facie case against the defendants, American Mineral Spirits Company and Union Oil Company of California" but insist that they were entitled to go to the jury with their case against Mackey Paint Mfg. Co. We must, therefore, determine whether the trial court erred in directing a verdict in favor of Mackey Paint Mfg. Co.
The plaintiffs presented two theories of liability against Mackey. First, it was their contention that Mackey was negligent in selling Xylol to the defendant, Fayette Fabricators, since Mackey knew or should have known that Fayette Fabricators would use it around operations which produced heat and sparks. They also charged negligence on the part of Mackey in failing to adequately warn the user of the product, Fayette Fabricators, of the dangerous propensities *Page 513 
of Xylol. They limit their argument on appeal to the latter. They insist that there was evidence from which the jury could have found the warning inadequate.
Mr. McKinney, the president of Fayette Fabricators, testified that he manufactures bumpers which are used on motor vehicles. The bumpers are stamped out of metal by a hydraulic press, then put through a welding process, and finally buffed by using a grinding wheel. They are then dipped in a vat to be cleaned, then primed and painted and lettered out with red letters. They are then ready for shipment.
Some three months before the fire which destroyed the building involved in this litigation, another fire had occurred in the plant. Employees of Fayette Fabricators testified that the first fire was caused by a spark. The grinding wheels are located eight or ten feet from the dipping vat. When they are being operated, sparks fly off "like the sparklers that you have at Christmas time." Five grinding operations were going on at the time the fire occurred. Two were grinding about seven or eight feet from the vat and sparks were flying in the direction of the vat. The sparks were hot enough to burn the operator's clothes. The grinding wheels were not relocated after the first fire.
Mr. McKinney designed the dip vats and had been buying Xylol from Mackey Paint Mfg. Co. for a long time to be used as a paint thinner. He bought the paint used to paint the bumpers from Mackey Paint Mfg. Co. and Xylol came with it as a paint thinner. He, Mr. McKinney, started using Xylol as a reducing agent to clean the bumpers, but he never discussed this use with Mackey and never asked them whether he should or should not use it for that purpose. He had been using the dipping vats two or three months before the fire occurred. A salesman from Mackey would come to the plant about once a month. Mr. McKinney had no idea whether salesmen had ever seen the dipping vats. A Mackey salesman would never have had an occasion to see the grinding operations.
Mr. McKinney knew that Xylol was flammable. It came in 55-gallon drums and each drum carried a red label marked:
 "KEEP COOL CAUTION ______________________ Name of Contents
"FLAMMABLE —
"Keep away from FIRE, Heat and Open-flame lights
 "DO NOT DROP "This is to certify that the contents of this package are properly described by name and are sacked and are in proper condition for transportation according to the Regulations prescribed by the Interstate Commerce Commission."
In addition to these labels, each bill of lading carried a similar warning. Besides the warnings, Mr. McKinney knew enough about the paint thinner to know that it was flammable and he knew that it would catch fire.
The plaintiffs called Mr. William Mackey, a member of the board of directors of Mackey Paint Mfg. Co., as an adverse witness. He testified that Xylol is a trade name. It is chemically an aliphatic solvent, which is used primarily in making paint. He bought Xylol from several suppliers. It is bought in 5,000-gallon tanks and Mackey sells it in 55-gallon drums. His suppliers describe the chemical nature of the product. When shipped in Interstate Commerce, any product which has a flash point of 80° or under must carry a red label. Xylol has a flash point over 80° and, therefore, is not required by Interstate Commerce Regulations to carry a red label, but it is the practice of Mackey to label the drums which they ship with a red label anyway. The red label attached to each drum of Xylol is not required but is only required for products shipped in Interstate Commerce which are extremely flammable and dangerous. In other words, the red label *Page 514 
attached to the drums of Xylol carries a warning which is required by the Interstate Commerce Commission only for more dangerous products. Mackey just uses them anyway "as an ounce of precaution." They also put on each bill of lading a warning that the product is a flammable liquid. Xylol is very much like mineral spirits.
The thrust of plaintiffs' argument is that Mackey should have included on the label an indication of the flash point of Xylol.
The flash point is the lowest temperature at which the vapors above a volatile combustible substance ignite momentarily in air when tested under controlled conditions. The degree of flammability of a liquid is expressed in terms of its flash point.
Under these facts, which were not disputed, we do not believe a jury issue was made out as to the adequacy of the warning. The testimony of Mr. McKinney and other of his employees was not disputed. They testified that they knew that the Xylol would catch fire when sparks from the grinding wheels hit it. They knew that that was what caused the earlier fire. We fail to see what the failure of the warning to carry the flash point of Xylol in anywise affected Fayette Fabricators' use of that substance. Such a warning would not have supplied Fayette Fabricators with any information its employees and officers did not already have.
There is an additional reason for affirming the trial court in granting Mackey's motion for directed verdict. The evidence is undisputed that Fayette Fabricators did not put the product involved here to its intended use. Mr. McKinney testified that he bought Xylol from Mackey to thin paint. He began using it to dip the bumpers in without discussing that use with Mackey. The duty to warn users of the dangerous propensities of a product applies only when such products are dangerous when put to their intended use. Norton Co. v. Harrelson, 278 Ala. 85,176 So.2d 18 (1965); Defore v. Bourjois, Inc., 268 Ala. 228,105 So.2d 846 (1958).
Although this case was tried long before this court adopted the extended manufacturer's liability doctrine, Casrell v.Altec Industries, Inc., Ala., 335 So.2d 128 (1976), we note that the result would be the same had it proceeded under that theory. There we held that a ". . . manufacturer, or supplier, or seller, who markets a product not reasonably safe when applied to its intended use in the usual and customary manner, constitutes negligence as a matter of law." (335 So.2d at 132) The user's misuse of the product constitutes a valid defense under the "extended manufacturer's liability doctrine." Atkinsv. American Motors Corp., Ala., 335 So.2d 134 (1976).
We have carefully read the evidence in this case and are convinced that the plaintiffs failed to prove any theory of liability insofar as Mackey Paint Mfg. Co. was concerned. We find no error in the trial court's directing a verdict in favor of Mackey.
The only other alleged error complained of by the plaintiffs on this appeal is the refusal of the trial court to permit them to call Mr. McKinney, the president and managing officer of Fayette Fabricators at the time of the fire, as an adverse witness under ARCP 43 (b).
Mr. McKinney was no longer employed by Fayette Fabricators at the time of the trial. The appellee argues, therefore, that the plaintiffs were not entitled to call him as an adverse witness under Rule 43 (b). Clearly, Mr. McKinney was a hostile witness under Rule 43 (b) and, as such, the plaintiffs were entitled to ask him leading questions. Although the trial court refused to allow the plaintiffs to call Mr. McKinney as "an adverse party" under the third sentence of Rule 43 (b), it did allow the plaintiffs to fully and completely examine him, including the use of leading questions. In fact, it was Mr. McKinney's testimony which, for the most part, made out the *Page 515 
plaintiffs' case against Fayette Fabricators. Under these circumstances, we do not think error requiring a new trial is apparent. We agree with the plaintiffs that Mr. McKinney was an adverse witness under Rule 43 (b); but, since the trial court allowed the same treatment of him as would have obtained had the plaintiffs been allowed to call him as such, we find no error to reverse.
AFFIRMED.
TORBERT, C.J., and MADDOX, FAULKNER and BEATTY, JJ., concur.