**Douglas Norman RUDD, Plaintiff,**

v.

**GENERAL MOTORS CORPORATION, Defendant.**

**No. CIV. A. 00–T–105–E.**

United States District Court,
M.D. Alabama,
Eastern Division.

Jan. 19, 2001.

**1332**

Hoyt W. Hill, Walker, Hill, Adams, Umbach, Meadows & Walton, Opelika, AL, James T. Gullage, Gullage & Williams, Auburn, AL, for Douglas Norman Rudd, plaintiff.

D. Alan Thomas, Gregory L. Schuck, Huie, Fernambucq & Stewart, Birmingham, AL, Timothy S. Coon, Thomas J. Sweeney, Eckert Seamans Cherin & Mellott, LLC, Pittsburgh, PA, for General Motors Corporation, A Delaware Corporation, defendant.

## ORDER

MYRON H. THOMPSON, District Judge.

In this civil action, plaintiff Douglas Norman Rudd brings suit to recover damages from defendant General Motors Corporation ("GM") for injuries sustained when a fan blade on Rudd's 1970 GM pickup truck broke loose and struck him while he was in front of the vehicle's open hood. Jurisdiction over this diversity action is proper under 28 U.S.C.A. § 1332. This case is currently before the court on a summary-judgment motion by GM, which, for reasons set forth below, will be granted in part and denied in part.

## I. BACKGROUND

On February 2, 2000, Rudd filed a complaint in this court seeking five million dollars in damages from GM as compensation for serious and permanently disabling injuries resulting from the separation and propulsion of his truck's fan blade into his head, neck, and left arm while he was advancing the truck's timing. Rudd contends that the fan is a GM product; that it was defective at the time GM manufactured and placed it into the stream of commerce; and that the fan's defects proximately caused his injuries. More specifically, Rudd alleges that GM is liable under the Alabama Extended Manufacturer's Liability Doctrine ("AEMLD") on account of each of three fan-related defects: manufacturing flaws in the fan's metal that rendered the fan vulnerable to "fatigue failure" over time; GM's failure to equip the fan with a protective guard to shield people in the event of any blade separation; and GM's failure to provide adequate warning about the risk of fan-blade separation.[1] Rudd also makes the argument that GM's failure to equip the fan with a protective guard, as well as its failure to provide adequate warning about the risk of fan blade separation, constitutes negligence under Alabama law.

On October 10, 2000, GM moved for summary judgment against Rudd on both his AEMLD and negligence claims. GM argues that Rudd has produced no admissible evidence that would support an infer-

---

1. At least for purposes of this motion, GM accepts that the fan-blade separation occurred because of a fatigue fracture, that is, a fracture that developed gradually rather than instantaneously. *See* GM's Reply Brief in Response to Rudd's Response to GM's Motion for Summary Judgment, filed November 9, 2000, at 1. The disputed issue is about the cause of the fatigue fracture that led to the fan-blade separation.

ence of a defect in the fan metal, and that he has not alleged sufficient facts to make out a prima-facie case for his lack-of-protective-shield and failure-to-warn claims. GM also contests the very notion that the fan is a GM product. However, on this last issue, GM concedes "there is a substantial dispute" and "for the purpose of this motion only GM has assumed that the cooling fan is a GM part."[2] Thus, the only issues currently before the court relates to whether—assuming the accident fan is a GM part—there is enough admissible evidence to justify putting Rudd's AEMLD and negligence claims before the factfinder.

## II. LEGAL STANDARDS

### A. *The AEMLD*

■ The Alabama Supreme Court has expressly modeled its AEMLD on § 402A of the Second Restatement of Torts and the landmark line of common-law cases beginning with Judge Cardozo's *MacPherson v. Buick Motor Co.*, 217 N.Y. 382, 111 N.E. 1050 (1916), that allow consumer tort recovery without privity of contract between a manufacturer and an injured party, and without direct proof of negligence in the manufacturing process. *See Atkins v. American Motors Corp.*, 335 So.2d 134, 137–138 (Ala.1976); *see also* Restatement of the Law, Third, Torts: Products Liability, § 3, at 111. However, the Alabama doctrine departs somewhat from the Restatement's strict-liability regime in retaining aspects of a fault-based system. *See Atkins*, 335 So.2d at 140. To affirm the importance of "moral culpability," the AEMLD makes certain affirmative defenses and general denials available to defendant manufacturers. *Id.* at 137–139. Absent such defenses, however, culpable "scienter is supplied as a matter of law" when a plaintiff shows that a manufacturer placed a product into the stream of commerce that was unreasonably dangerous when put to its intended use. *Id.* at 141;

*see also id.* at 140, 139. "[A] defendant is liable if he puts on the market a product which is not reasonably safe, and the plaintiff is injured as a result of a contemplated use of that product." *Id.* at 140; *see also Taylor v. General Motors Corp.*, 707 So.2d 198, 201 (Ala.1997).

"To establish liability:

(1) A plaintiff must prove he suffered injury or damages to himself or his property by one who sold a product in a defective condition unreasonably dangerous to the plaintiff as the ultimate user or consumer, if

(a) the seller was engaged in the business of selling such a product, and

(b) it was expected to, and did, reach the user or consumer without substantial change in the condition in which it was sold."

*Atkins*, 335 So.2d at 141; *see also Reynolds v. Bridgestone/Firestone, Inc.*, 989 F.2d 465, 469–470 (11th Cir.1993); *Jordan v. General Motors Corp.*, 581 So.2d 835 (Ala.1991); *Casrell v. Altec Industries, Inc.*, 335 So.2d 128, 132 (Ala.1976).

■ For purposes of the AEMLD, "a 'defect' is that which renders a product 'unreasonably dangerous,' i.e., not fit for its intended purpose." *Casrell*, 335 So.2d 128, 133 (internal citations omitted). "[I]t makes no difference whether [a product] is dangerous by design or defect. The important factor is whether it is safe or dangerous when the product is used as it was intended to be used. However, danger may be obviated by an adequate warning." *Id.* The question "Whether a product is 'unreasonably dangerous' is for the trier of fact." *Id.*

### B. *Admissibility of Expert Testimony*

■ The Federal Rules of Evidence govern the admissibility of expert testimony. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 587, 113 S.Ct.

**2.** GM's Brief in Support of its Motion for Summary Judgment, filed October 10, 2000, at 3; GM's Motion for Summary Judgment, filed October 10, 2000, at ¶ 1.

2786, 2793, 125 L.Ed.2d 469 (1993). Under the federal rules, the trial judge serves a gatekeeping function, making both a 'relevance' and a 'reliability' determination, that is, disallowing expert testimony when it will not be helpful to the trier of fact or when it lacks a reliable foundation. *See id.* at 589, 113 S.Ct. at 2795; Fed.R.Evid. 702; *id.,* advisory committee notes, 2000 amendment; *see also* Fed.R.Evid. 104(a) (preliminary questions of admissibility shall be determined by the court which, in making its determination is not itself bound by all the exclusionary rules of evidence).[3] A trial judge performs this gatekeeping function by applying the Federal Rules of Evidence, especially Rule 702. Rule 702, as amended effective December 1, 2000, provides:

> "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."

■ The burden is traditionally placed on the proponent of expert testimony to establish that such admissibility requirements have been met by a "preponderance of the evidence." *See Bourjaily v. United States,* 483 U.S. 171, 172–173, 107 S.Ct. 2775, 2776–2777, 97 L.Ed.2d 144 (1987) (while Rule of Evidence 104(a) assigns the court the task of determining preliminary admissibility questions without specifying any particular standard of proof of reliability, a preponderance-of-proof standard is traditionally imposed regardless of the

---

**3.** At the time of the pretrial hearing in this case, GM inserted into the pretrial order a request for a *"Daubert* hearing" to determine the admissibility of expert testimony offered by Rudd (specifically testimony offered to identify the fan as a GM product and to prove that a manufacturing defect was ultimately responsible for the fatigue failure of the fan blade). For purposes of the present summary-judgment motion, however, this court will make the admissibility decisions necessary for this decision on the basis of the record already before it. The parties have provided substantial argument about the relevant admissibility issues in their submissions to the court, and, at the pretrial hearing, even counsel for GM did not appear to clearly want a separate evidentiary hearing at this stage (*e.g.* without suggesting any interest in, or expectation of, a prior *Daubert* hearing, counsel noted that the parties' next steps towards settlement await this court's pending summary-judgment decision). A trial court is entitled to make a decision on the admissibility of expert testimony without a hearing if the parties have presented a sufficient basis for the testimony. *See United States v. Majors,* 196 F.3d 1206, 1215 (11th Cir.1999) (the trial court did not abuse its discretion in deciding to admit expert testimony without the benefit of a *Daubert* hearing after determining that the expert possessed specialized knowledge by virtue of his practical training and experi-

ence), *cert. denied,* 529 U.S. 1137, 120 S.Ct. 2022, 146 L.Ed.2d 969 (2000); *City of Tuscaloosa v. Harcros Chemicals, Inc.,* 158 F.3d 548, 564 n. 21 (11th Cir.1998) (while complicated cases involving multiple expert witnesses are well-served by the holding of a *Daubert* hearing, such hearings are not required by law or by rules of procedure); *see also Kirstein v. Parks Corp.,* 159 F.3d 1065, 1067 (7th Cir.1998) (a products liability plaintiff was not automatically entitled to a hearing on the admissibility of expert testimony), *cert. denied,* 526 U.S. 1065, 119 S.Ct. 1456, 143 L.Ed.2d 542 (1999); Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence, §§ 702.02[2], 702.05[2][a] (Joseph M. McLaughlin, ed., Matthew Bender 2d ed.2000) (it is within the trial judge's discretion whether to hold an admissibility hearing); Fed.R.Evid. 702, advisory committee notes, 2000 amendment ("The amendment makes no attempt to set forth procedural requirements for exercising the trial court's gatekeeping function over expert testimony"); Fed.R.Evid. 104(c) ("Hearings on other preliminary matters shall be so conducted [i.e. held out of the hearing of the jury] when the interests of justice require"); *cf. Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 152, 119 S.Ct. 1167, 1176, 143 L.Ed.2d 238 (1999) (a trial court has authority to avoid unnecessary proceedings "in ordinary cases where the reliability of an expert's methods is properly taken for granted").

burden of proof on the substantive issues); *Allison v. McGhan Medical Corporation,* 184 F.3d 1300, 1312 (11th Cir.1999) ("the proponent of the testimony does not have the burden of proving that it is scientifically correct, but that by a preponderance of the evidence, it is reliable"); Fed.R.Evid. 702, advisory committee notes, 2000 amendment.

According to the advisory committee notes, Rule 702 was amended, effective December 1, 2000, in order expressly to endorse the gatekeeping model of the trial judge envisioned by the Supreme Court in *Daubert.* This judicial screening of expert testimony before it reaches the factfinder is justified by the fact that expert witnesses are given wider latitude to offer opinions than that afforded other witnesses under the federal rules, including, for example, a relaxation of the usual requirement of firsthand knowledge. *See Daubert,* 509 U.S. at 592, 113 S.Ct. at 2796. The trial judge's gatekeeping inquiry, when properly conducted, avoids usurping the role of the trier of fact, said the *Daubert* court, because the court's "focus ... must be solely on principles and methodology, not on the conclusions that they generate." *Id.* at 595, 113 S.Ct. at 2797.

In *Daubert,* the Supreme Court set forth a list of factors that may guide the trial judge's Rule 702 decision as to whether expert testimony might reliably assist the factfinder, including: whether a theory or technique can be or has been tested; whether a theory or technique has been subjected to peer review or publication; whether a theory or technique has gained widespread acceptance within a relevant community of experts, or, rather, has been unable to garner more than minimal support; and the known or potential rate of error of a technique, and the existence and maintenance of standards controlling the technique's operation. *See id.* at 593–594, 113 S.Ct. at 2796–2797.

These *Daubert* factors are not, the Supreme Court has emphasized, appropriately used as a "definitive checklist" but should instead be understood as non-exclusive, nondispositive considerations that may shape the trial judge's "flexible inquiry" under Rule 702. *See id.* at 594, 113 S.Ct. at 2797; *see also Kumho Tire Company, Ltd. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (the trial judge must have considerable leeway in deciding how to go about determining whether particular expert testimony is reliable but should consider the specific factors identified in *Daubert* where they are reasonable measures of reliability); *United States v. Paul,* 175 F.3d 906, 910–911, (11th Cir.1999) (affirming the admission of a handwriting expert's testimony without specifically applying or reviewing the *Daubert* factors, and explaining that "Daubert's list of specific factors neither necessarily nor solely applies to all experts or in every case"); *United States v. Cunningham,* 194 F.3d 1186, 1194 (11th Cir.1999); *United States v. Zapata,* 139 F.3d 1355, 1357 (11th Cir.1998). Consistent with this understanding, the advisory committee notes for Rule 702 explain that the 2000 amendment, while intended as an endorsement of the *Daubert* conception of the trial judge as gatekeeper, was not intended to "codify" the specific factors mentioned in *Daubert.*

In *Kumho,* an automobile-products liability case, the Supreme Court clarified that the trial court's Rule 702 gatekeeping responsibilities obtain equally for all expert testimony, not just scientific testimony. 526 U.S. at 142, 119 S.Ct. at 1171. The *Kumho* Court held that the trial judge below did not abuse his discretion when he excluded the technical or engineering testimony of a tire-failure analyst under a *Daubert*-type inquiry into reliability. *See id.* at 158, 119 S.Ct. at 1179. The trial judge had found the depositions of the plaintiff's would-be expert witness to be riddled with internal inconsistencies and had determined that, in light of the four *Daubert* factors, the expert's theory "fell outside the range where experts might reasonably differ" and was, thus, too unreliable to be

allowed before the jury. *See id.* at 142–146, 153–158, 119 S.Ct. at 1167–1173, 1176–1179.

While *Kumho* affirmed the potential applicability of the *Daubert* factors to testimony that is technical-, engineering-, or experience-based, the *Kumho* Court also made it clear that a trial court should tailor its Rule 702 evaluation to the particular circumstances before it, and that the *Daubert*-type analysis should not be used to disfavor expert testimony grounded in experience or engineering practice rather than in pure scientific theory:

> "Engineering testimony rests upon scientific foundations, the reliability of which will be at issue in some cases. In other cases, the relevant reliability concerns may focus upon personal knowledge or experience.... [T]here are many different kinds of experts, and many different kinds of expertise. Our emphasis on the word 'may' [in the question presented, whether a trial judge may apply the *Daubert* factors to nonscientific testimony] thus reflects *Daubert*'s description of the Rule 702 inquiry as a flexible one.... [T]he gatekeeping inquiry must be tied to the facts of a particular case."

*Id.* at 150, 119 S.Ct. at 1175 (internal citations and quotations omitted).

The advisory committee notes for Rule 702, as amended effective December 1, 2000, comment that the amended rule was formulated in part to affirm *Kumho*'s holding that the trial judge's gatekeeper function applies to all expert testimony. But the newly-expanded rule goes further than *Kumho* to "provide[ ] some general standards that the trial court *must* use to assess the reliability and helpfulness of

proffered expert testimony." *Id.* (emphasis added). While there is a dearth of caselaw interpreting the new reliability standards set forth in Rule 702 (that "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case"),[4] the advisory committee notes provide some guidance, remarking that

> "Nothing in this amendment is intended to suggest that experience alone—or experience in conjunction with other knowledge, skill, training or education—may not provide a sufficient foundation for expert testimony.... If the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply taking the expert's word for it."

*Id.* (internal citations and quotations omitted).

While the inquiry into "reliable principles and methods" has been a familiar feature of admissibility analysis under *Daubert,* the new Rule 702 appears to require a trial judge to make an evaluation that delves more into the facts than was recommended in *Daubert,* including as the rule does an inquiry into the sufficiency of the testimony's basis ("the testimony is based upon sufficient facts or data") and an inquiry into the application of a methodology to the facts ("the witness has applied the principles and methods reliably to the facts of the case").[5] *See Daubert,*

---

4. This court has not found any reported case interpreting the amended version of Rule 702. In a July 2000 decision, *Falise v. American Tobacco Company,* 107 F.Supp.2d 200, 203, 205–206 (E.D.N.Y.2000), Judge Weinstein cites the new standards, and observes that some of the expert testimony before him satisfies those standards.

5. As will be clarified further below, this sufficiency-of-basis inquiry is formally quite distinct from the sufficiency-of-evidence inquiry involved in summary-judgment analysis, that is, Rule 702 mandates a determination of whether the expert had sufficient evidence (evidence which itself may or may not be admissible) to support his or her testimony, not a determination of whether that testimony

*supra;* Fed.R.Evid. 702; Richard T. Stilwell, *Kumho Tire: The Battle of the Experts Continues,* 19 Rev. Litig. 193, 210–213 (Spring 2000). Neither of these two latter questions that are now mandatory under the new rule—the inquiries into the sufficiency of the testimony's basis and the reliability of the methodology's application—were expressly part of the formal admissibility analysis under *Daubert.*

However, while this court can find no caselaw precisely implementing these kinds of analyses, the amended rule's reliability-of-application inquiry was at least foreshadowed in *General Electric Co. v. Joiner,* 522 U.S. 136, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997), where the Supreme Court suggested that *Daubert*'s distinction between factual conclusions and methodology might be too sharply-drawn. *See Joiner,* 522 U.S. at 146, 118 S.Ct. at 519 (in some cases a trial court "may conclude that there is simply too great an analytical gap between the data and the opinion proffered"); *see also* Fed.R.Evid. 702, advisory committee notes, 2000 amendment (discussing *Joiner* and stating that the revised version of Rule 702 incorporates a conscious rejection of *Daubert*'s sharply-drawn conclusions-versus-methodology distinction).

■ Going beyond the permissive language of *Joiner,* the plain language of new Rule 702, as well as the advisory committee notes to the new Rule, makes it clear that this court is now *obliged* to screen expert testimony to ensure it stems from, not just a reliable methodology, but also a sufficient factual basis and reliable application of the methodology to the facts. Despite this express provision for judicial

evaluation of such factually-entwined matters, however, the advisory committee notes caution that the trial judge must still avoid usurping the role of the trier of fact:

> "[The revised rule] is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other. . . . [T]he rejection of expert testimony is the exception rather than the rule. *Daubert* did not work a seachange over federal evidence law, and the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system. Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."

Fed.R.Evid. 702, advisory committee notes, 2000 amendment (internal citations and quotations omitted).

### C. Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." "Where, as here, the non-moving party bears the burden of proof on an issue at trial, the moving party, in order to prevail, must do one of two things: show that the non-moving party has no evidence to support its case, or

standing alone provides sufficient evidence to allow a reasonable fact-finder to find for the plaintiff on an issue of substantive law. *See, e.g.,* Fed.R.Evid. 702, advisory committee notes, 2000 amendment (under the new rule, for purposes of determining the sufficiency of the basis of an expert's testimony, the expert's "facts or data" may include inadmissible testimony, hypothetical facts and the reliable opinions of other experts). Although these two inquiries turn out to resemble each other

in the present case, they could easily diverge in other circumstances. For example, Rudd could have offered an expert whose testimony was geared solely towards excluding one of several alternative theories of accident causation. If there were a sufficient basis to establish the reliability of that testimony, it would be immaterial for admissibility purposes that that testimony, standing alone, would not also be sufficient to withstand summary judgment.

present 'affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial.'" *Hammer v. Slater,* 20 F.3d 1137, 1141 (11th Cir. 1994) (quoting *United States v. Four Parcels of Real Property,* 941 F.2d 1428, 1437–38 (11th Cir.1991) (en banc)); *see also Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1115–17 (11th Cir.1993) (describing the responsibilities of the summary judgment movant and non-movant as dependent upon the burden of proof at trial).

Once the party seeking summary judgment has informed the court of the basis for its motion, the burden shifts to the non-moving party to demonstrate why summary judgment would be inappropriate. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). To this end, the non-moving party must affirmatively set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of his or her pleadings. *See* Fed. R.Civ.P. 56(e).

The court's role at the summary-judgment stage is not to weigh the evidence or to determine the truth of the matter, but rather to determine only whether a genuine issue exists for trial. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). In making this determination, the court must view the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences in its favor. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

### III. DISCUSSION

A. *Admissibility of Rudd's Proposed Expert Testimony Regarding a Defect in the Fan Metal*

■ "[O]rdinarily, expert testimony is required" in AEMLD cases, *Sears, Roebuck & Co., Inc. v. Haven Hills Farm, Inc.,* 395 So.2d 991, 995 (Ala.1981), and Rudd has met this expectation by offering three expert witnesses, Preston Brazell, Semih Genculu, and Harry Edmondson. Brazell is an automotive mechanic with over 30 years experience and training in the repair and rebuilding of motor vehicles, especially GM products; Genculu is a metallurgist and materials engineer with extensive experience in failure analysis and materials testing; and Edmondson is a mechanical engineer with extensive experience in the field of failure analysis.

In the pretrial order, GM has specifically objected to the admission of Edmondson's opinion that a manufacturing defect caused the fan-blade separation, and, more generally, the company has requested an admissibility hearing for any testimony by any of Rudd's experts that implicates an opinion that the fan or truck was defective.[6] Genculu's testimony does include evidentiary claims bearing on the "defect" issue. This court will not, however, discuss Genculu's testimony because it is not necessary for resolving the present motion for summary judgment, and because it is unclear whether GM has any specific objections that will remain viable in light of this court's Rule 702 discussion.

6. The pretrial order also includes a GM request that the court conduct an admissibility hearing for any expert testimony offering an opinion that the fan was a GM product. *See* Order on Pretrial Hearing, filed December 4, 2000, at 5. However, given that GM has already conceded in its motion for summary judgment that there is a genuine factual dispute about the identity of the fan's manufacturer, and given that Rudd's identification of the fan as a GM product depends upon expert testimony, the company presumably believes that at least some of Rudd's expert testimony about identification is admissible. *See* GM's Brief in Support of its Motion for Summary Judgment, filed October 10, 2000, at 3. Because this court cannot discern which identification testimony GM concedes to be admissible, and because GM has agreed to deem the fan a GM product for purposes of the present motion, this court cannot evaluate GM's objections to the admissibility of such identification testimony. Brazell's testimony speaks primarily to the issue of identification, and thus will not be discussed further in this opinion.

If GM continues to have admissibility objections (or if Rudd has objections to GM's expert testimony), such may be raised in specific form at a later date. *See* Reference Manual on Scientific Evidence, Second Edition, 28–29 ("In civil cases, a court might respond to a motion in limine by refusing to undertake any reliability-relevancy determination until the movant has made a prima facie showing of specific deficiencies in the opponent's proposed testimony.")

GM makes it clear that it does not question the competence of any of Rudd's expert witnesses or the relevance of their opinion testimony: "GM's motion does not challenge the *qualifications* of plaintiff's experts or the fact that they have offered opinions on certain issues. . . ."[7] Rather, GM's evidentiary challenge appears to be limited to a sufficiency-of-basis objection that there is an "admitted lack of evidence" to support Rudd's expert testimony regarding a fan-metal defect.[8]

Under *Daubert, Joiner*, and old Rule 702, it might be a close question whether a factual sufficiency-of-basis inquiry like that requested by GM should even be part of a trial judge's gatekeeping decision. Under the newly-amended Rule 702, however, a "quantitative" inquiry into whether "the testimony is based upon sufficient facts or data" is not only permissible but expressly mandated. *See* Fed.R.Evid. 702; Fed. R.Evid. 702, advisory committee notes, 2000 amendment. Thus, the admissibility analysis in this case will vary depending upon whether this court should apply the new rule, in whole or in part, or rather should fall back on old Rule 702. Rudd's

complaint commenced on February 2, 2000, that is, prior to December 1, 2000, the effective date of the amendment. But the new Rule 702 "shall govern all proceedings in civil cases" pending December 1, 2000, "insofar as just and practicable." Orders of the Supreme Court of the United States Adopting and Amending Rules, Order of April 17, 2000.

■ In the present case, pending as it was December 1, this court finds that it is "just and practicable" to employ new Rule 702 to judge the admissibility of at least the testimony specifically challenged by GM, that is, Edmondson's statements relating to a manufacturing defect in the fan metal. First, even though the testimony in the record of all three of Rudd's experts was given prior to December 1, GM's contentions in the pretrial order include a reference to the new Rule 702, and no objection to its application was registered.[9] More important, this court finds that neither party's case suffers for the court's use of the amended rule. With new Rule 702 in play, GM gets a judicial-gatekeeping inquiry governed by a rule that contains all of the language of the old rule plus new language expressly authorizing GM's sufficiency-of-basis objection, that is, a line of inquiry that might not even have been available under old Rule 702. And Rudd's case is not unduly prejudiced because—despite the fact his submissions to the court were evidently prepared with only the old rule in mind[10]—Edmondson's testimony regarding a fan-metal defect turns out to satisfy the new standards.

**7.** *See* GM's Reply to Rudd's Response to Motion for Summary Judgment, filed November 11, 2000, at 1 (emphasis in original).

**8.** *See id.* In this argument, GM freely mixes summary-judgment standards with evidentiary standards and caselaw. This court assumes that GM means to make two analytically distinct arguments, (1) that there is insufficient supporting evidence under Rule 702 to justify admission of some or all of Rudd's expert testimony about a fan-metal defect, and (2) that there is insufficient ad-

missible evidence on the substantive element of a defect under the AEMLD to allow Rudd's case to survive summary judgment and reach the jury.

**9.** *See* Order on Pretrial Hearing, filed December 4, 2000, at 5.

**10.** *See, e.g.,* Rudd's Brief in Opposition to Defendant's Motion for Summary Judgment, filed October 26, 2000, at 20.

■ The aspects of Edmondson's testimony that relate to the possibility of a fan defect (gleaned from his Rule 26 report and especially his deposition) can be summarized as follows. Edmondson's 'opinion number one' is that Rudd's operation of his truck prior to the accident was normal behavior.[11] This opinion is based on Rudd's testimony that, at the time of the accident, he was running his engine at about 1200 to 1500 RPM's while twisting the housing of the distributor in order to adjust the timing.[12] Edmondson testified that 1200 to 1500 RPM's is within normal engine-speed ranges, and that setting a vehicle's timing by twisting the distributor is both a method that Edmondson himself has used and a method specifically recommended by GM tune-up manuals.[13]

Edmondson's 'opinion number two' is that the fan blade was not bent prior to the accident, and that no visible damage in the fan could explain the fatigue fracture that led to the blade separation. Based on visual examination, "total indicator reading" measurements, and his background reading, Edmondson determined that there was some warping of the fan assembly, that is, "either the shaft [attached to the water pump] or the pulley was bent," a kind of warping that can be explained by use or time.[14] He emphasized that he "did not claim there was no damage to the fan assembly," and was not excluding the possible existence of "any kind of little nick or dent."[15] Edmondson "[held] the fan blade in position [where it had been attached] and look[ed] for any evidence that the fan blade had been bent ... and didn't see any of that," including especially at the site of the fracture origin.[16]

Edmondson offered an 'opinion number three' that Rudd's pre-accident operation of his truck would not have caused a non-defective fan to break, an opinion which he later expanded into a conclusion with a "reasonable degree of engineering certainty" that the fan blade must have been marred by a microscopic defect.[17] He began his explanation of this conclusion by remarking:

> "I think that the fan blade had to have some small defect for the fatigue failure to start. As to whether it was a machine mark left during the manufacturing process or whether it was whatever, it was right where—it had to be right here because the maximum bending stress on this blade is at the base of it because the fan is pushing air and the load is out here and the load times the distance, the maximum stress is going to be right here where it attaches (indicating). The opposite blade is coming across there and providing more or less a stop or a pivot for the blade to bend around. So there has to be some small defect or some small something for the fracture or for the fatigue crack to start at."[18]

Edmondson then rehearsed a list of the reasons a metal-fatigue fracture might occur: (1) the nature of the material itself, if the metal were composed of high-strength alloys, as is not the case with the accident fan; (2) a grind mark or microscopic-level scratch or imperfection that might be left during the manufacturing process; and (3) disruption in the cast material, if the component is a cast product, "where there's either an inclusion of some sort that amounts to a stress riser or it could be a

---

11. *See* Exhibit 8, Edmondson's Rule 26 Report, filed October 10, 2000, at 2.

12. *See id.;* Exhibit 9, Edmondson's Deposition, filed October 10, 2000, at 41.

13. *See id.*

14. *See id.* at 35–26.

15. *See id.* at 41–22.

16. *See id.* at 42–43.

17. *See* Exhibit 8, Edmondson's Rule 26 Report, filed October 10, 2000, at 2; Exhibit 9, Edmondson's Deposition, filed October 10, 2000, at 62, 45–70.

18. *See id.* at 46–47.

gas bubble that amounts to a stress riser." [19]

When pressed, Edmondson explained that these three explanations are those he has encountered in his experience as a metal-failure analyst but that they are not the only possible explanations for metal-fatigue fractures in every kind of metal.[20] Edmondson felt he could exclude the possibility of a catastrophic or abnormal-use cause for the accident-fan's fatigue fracture because a "one-time overload fracture", that is, a different kind of fracture from the stress fracture on Rudd's fan, would result from any stress load or vibration level beyond that associated with the fan's designed capability.[21] If the fan were defective as a result of "some force, object, accident," the fan's surface would have discernable marks indicating such an occurrence, and there are no such marks.[22] Edmondson could offer no direct evidence that the fan metal had inappropriate materials, inclusions, microscopic-level scratches, or other imperfections.[23] But that lack did not detract from his confidence "to a reasonable degree of engineering certainty" that the fan metal contained some such microscopic defect (either a scratch or mark or an inclusion) because he had gone through a process of eliminating the alternative explanations.[24]

Once he narrowed down the explanations to those involving a microscopic defect, Edmondson further considered and eliminated various ways that the fracture might have resulted from a microscopic defect placed on the fan during its operation, that is, subsequent to the manufacturing process:

"[If] somebody had a file or they scratched it using a wire brush or ... they bent it, that would work harden a particular area.... [I]f I never found anything like that [*i.e.*, direct evidence of a manufacturing defect], how could I possibly list that as the cause of it.... And the reason is I think that there has to be some small irregularity that initiates the fatigue.... A manufacturing defect can be distinguished from a defect incurred later during operation.... [T]he defect that would come on to it during its operation typically would not have the same form as the one put on there in manufacturing. Manufacturing is using a stamping machine to stamp out the blades. It's using another stamping machine to form the shape of the blades. And I'm guessing that the holes were punched out on a dye and tool arrangement.... The sort of damage that it would get in usage would be, one, the more obvious is that somebody leaned into it and bent it and then saw that they had bent it and bent it back, so it had been overloaded. In other words, it got past its elastic limit and was actually bent to a new position and then bent back to the original position which would be damage to it.... If it were in a sandy, dusty area, you would expect to see the paint, if there was paint on the surface, see around where the blade was or on the outer tips of the blade, you'd see some sort of sandblasting or paint removal, that sort of thing. The other thing that you might see is if the mechanic were not very good in doing what I did this morning because of limited tools, using a pair of pliers and actually scarring with a tool ... you might see some scarring or denting with a tool. Those are the things that I would look for as a forensic engineer for the in-service type of damage." [25]

GM argues this testimony should be inadmissible because, the company says,

19. *See id.* at 49.

20. *See id.* at 50.

21. *See id.* at 50.

22. *See id.* at 62–63

23. *See id.* at 50–51.

24. *See id.* at 62–63.

25. *Id.* at 63, 65, 66, 69–70.

Edmondson concededly has no evidence behind his conclusion that a manufacturing defect caused the fatigue fracture in the fan metal.[26] But this characterization of Edmondson's testimony is misleading. Although Edmondson admits he did not find direct evidence of a manufacturing defect, such as a microscopic grind mark or inclusion near the fatigue-fracture origin, his testimony is replete with circumstantial evidence that—through a process of eliminating alternative explanations—might support a finding of a manufacturing defect.[27] Edmondson's testimony offers a list of alternative possible causes of a metal-fatigue fracture, a description of the physical indicia of alternative causes, and a claim that his physical examination revealed an absence of any of the physical indicia of alternative causes. These factual claims are no less relevant evidence for their circumstantial character:

> "As expert evidence, the testimony need only *assist* the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. As circumstantial evidence, [the expert's] data and testimony need not prove the plaintiffs' case by themselves; they must merely constitute one piece of the puzzle that the plaintiffs endeavor to assemble before the jury."

*Tuscaloosa v. Harcros Chemicals, Inc.*, 158 F.3d 548, 564 (11th Cir.1998); *see also Ambrosini v. Labarraque*, 101 F.3d 129, 135–136 (D.C.Cir.1996) (the dispositive relevance question in a *Daubert* admissibility inquiry is whether the testimony will assist the factfinder to understand the evidence or to determine a fact in issue, and not whether it will satisfy the plaintiff's burden on an ultimate issue for trial.)

By presenting facts and conclusions that purportedly negate alternative explanations for the metal-fatigue fracture, Edmondson's testimony about a manufacturing defect at least "constitute[s] one piece of the puzzle that the plaintiffs endeavor to assemble before the jury." *Harcros*, 158 F.3d at 564. Similarly, Edmondson's testimony that Rudd's pre-accident operation of his vehicle was normal, as well as his testimony that the fan had no pre-accident bending or visible damage connected to the fan-blade separation, could support Edmondson's manufacturing-defect conclusion by cutting against alternative explanations for the fan-blade separation; opinions one and two then likewise supply "piece[s] of the puzzle" that a jury might rationally consider relevant in its evaluation of Rudd's manufacturing-defect theory. *Id.* Thus, this court finds, by a preponderance of the evidence under Rule 702, that Edmondson's testimony relating to a fan-blade defect (including opinions number one, two and three) is relevant and will assist the jury in determining the issue of whether the fan metal was unreasonably dangerous when placed into the stream of commerce.

▮ The issue of whether Edmondson's challenged testimony is reliable presents a somewhat closer question. Ultimately, however, this court concludes, by a preponderance of the evidence, that Edmondson's testimony is reliable under Rule 702, that is, it is based upon sufficient data, reliable principles and methods, and reliable application of the methods to the facts. *See* Fed.R.Evid. 702. This does not, of course, mean that this court determines Edmondson's testimony to be true; rather, this court finds that his testimony falls within the range where experts might reasonably differ.

First, Edmondson's testimony has a sufficient factual basis. His investigative procedure involved consideration of the following: visual inspection of other fans (as well as a conscientious but failed effort to procure a fan identical to Rudd's fan), Rudd's testimony about the use history of the fan and truck, "total indicator reading"

---

**26.** *See* GM's Motion for Summary Judgment, filed October 10, 2000, at 2.

**27.** *See* Exhibit 9, Edmondson's Deposition, filed October 10, 2000, at 63, 65, 69–70.

measurements of the accident fan and assembly, two failure-analysis publications, *Understanding How Components Fail* and *Handbook of Case Histories in Failure Analysis,* including a case study of an automobile-fan fatigue fracture, GM tune-up manuals, visual inspection of the accident fan, including scrutiny of the fan for the physical indicia of alternative explanations for fatigue failure, and Edmondson's own past experience and training analyzing metal fractures, including laboratory-induced fractures and a 'real-world' automobile-fan fatigue fracture.[28]  *See* Fed. R.Evid. 702, advisory committee notes, 2000 amendment (sufficient "facts or data" underlying an expert's testimony may include inadmissible evidence, hypothetical facts, and other experts' opinions). Again, contrary to GM's contention, the fact that much of Edmondson's data constitutes circumstantial evidence does not of itself detract from their substantiality. *See, e.g., Harcros,* 158 F.3d at 564.

Second, Edmondson's method for settling on a cause for the fatigue-fracture through a process of eliminating alternative possible causes is, by a preponderance of the evidence, a reliable one. Inference chains built upon such circumstantial evidence are a well-established feature of admissible expert testimony. *See, e.g., id; Ambrosini v. Labarraque,* 101 F.3d 129, 140–141 (D.C.Cir.1996); *Carmichael v. Samyang Tire, Inc.* (S.D.Ala.1996) ("the Court perceives no inherent flaw in a process-of-elimination form of proof per se, so long as the underlying methodology is scientifically valid"), *rev'd,* 131 F.3d 1433 (11th Cir.1997), *rev'd sub nom Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). Further, Edmondson testified that this method was the one relied upon in a specialty-publication's model failure analysis: A case history of an automobile-fan metal-fatigue fracture in this failure-analysis text

reaches its conclusion that a fracture resulted from a metal defect near the fracture site, not on the basis of any direct evidence of such a defect, but on the basis of evidence allowing the exclusion of other possible causes.[29]  Edmondson's process-of-elimination method then not only satisfies the mandatory "reliable principles and methods" admissibility standard of new Rule 702 but, with this case history, also appears to satisfy the discretionary *Daubert* factors of publication and acceptance within a relevant community of experts. *See Daubert,* 509 U.S. at 593–594, 113 S.Ct. at 2796–2797.

Third, by a preponderance of the evidence, this court finds that Edmondson's application of this method to Rudd's fan (including his scrutiny of the metal for any of the physical indicia of alternative possible causes, and his elimination of the possibility of abnormal operation of the fan, as well as of any connection between visible fan imperfections and the fracture) is reliable. This is not to say that Edmondson's testimony on these reasoning processes is ideal. It would, for example, have been preferable if Edmondson had offered a systematic exposition of his testimony in his own report rather than require the court to piece together his analysis from the deposition questioning. More substantively, Edmondson's opinion testimony suffers from ambiguity on a crucial issue: he fails to make it clear whether he was stating with "a reasonable degree of engineering certainty" that the fan-metal fatigue fracture was caused by an imperceptible metal defect or, more tellingly for Rudd's AEMLD claim, that he meant he had that degree of confidence in his further conclusion that the fracture resulted from an imperceptible *manufacturing* defect in the fan metal.[30]  It may not be reasonable to expect Edmondson to assign any precise error rate to such practical-engineering conclusions. But it would be far easier to

---

**28.** *See id.* at 8, 9, 11, 13, 31, 32–36, 41, 42–43, 46–53, 59, 69–71.

**29.** *See id.* at 66.

**30.** *See id.* at 62–63.

evaluate his process-of-elimination if he had at least qualitatively clarified the level of confidence he has that he has not omitted to consider any realistically possible cause and that he has not neglected any possibility that one of the alternative causes could have occurred without its expected indicia.

However, even without a more definite statement about his degree of confidence that he has exhausted every possibility, Edmondson's testimony is reliable because he provides a step-by-step and transparent account of the explanations he has considered, the physical indicia he associates with each possible alternative cause, and his reasons for excluding each of the alternative causes. At no point does he attempt to rest simply on his authority as an expert; rather, each time Edmondson relies upon his experience, he "explain[s] how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed.R.Evid. 702, advisory committees notes, 2000 amendment. Edmondson's testimony is ultimately reliable because he has made his reasoning processes and data sources sufficiently transparent so that, if there are counter-arguments and counter-evidence available to suggest Edmondson has failed to consider a possible cause or is wrong to rely so conclusively on the physical indicia he has specified, the adversary system will be competent to make this evident through "vigorous cross-examination" and "presentation of contrary evidence." *Id.; see also Ambrosini v. Labarraque,* 101 F.3d at 140 (when an expert relies upon a process-of-elimination for testimony on specific causation, "the fact that several possible causes might remain uneliminated" goes to the weight rather than the admissibility of his testimony) (internal citations and quotations omitted).

### B. *Rudd's Defective Fan–Metal Claim under the AEMLD*

GM, in seeking summary judgment against Rudd, argues that Rudd has failed to establish a prima-facie AEMLD case for two reasons: (1) all of Rudd's expert testimony favoring a manufacturing-defect explanation for the fan-blade separation (especially Edmondson's testimony) is inadmissible, leaving Rudd with no admissible evidence with which to establish a "defect" under the AEMLD; and (2) as a matter of substantive law, Rudd's evidence regarding a defective fan blade—whatever its admissibility—cannot satisfy his burden of proof on the element of a "defect" under the AEMLD. GM's summary-judgment strategy is a negative one, hinging entirely on these twin arguments that Rudd has failed to establish even a prima-facie case under the AEMLD.[31]

GM's first argument fails because, as discussed above, Edmondson's testimony relating to a fan-metal defect is admissible in full. GM's second argument for summary judgment also fails, and for reasons quite parallel to the problems with the first argument. In its inadmissibility argument, GM has contended that Rudd's defect-related expert testimony cannot satisfy Rule 702 because it proceeds via a process-of-elimination and without direct evidence of a specifically-identified defect. Similarly, in its substantive-law argument, at least as formulated at the November 30, 2000, pretrial conference, GM contends that, even if Rudd's expert testimony were admissible, his prima-facie case cannot satisfy the AEMLD because it proceeds via a process-of-elimination and without direct evidence of a specifically-identified defect.

**31.** In the pretrial order, GM does tack on some rebuttal arguments and affirmative defenses against Rudd's case, that "the separation of the blade from the fan was caused by damage to the fan at some point during its operational history, and prior to Plaintiff's accident," and that "the actions of the Plaintiff on the date of the accident caused and/or substantially contributed to the accident ." *Order on Pretrial Hearing,* filed December 4, 2000, at 5, ¶¶ 4–5. But, since GM provides no evidence to support these arguments, they are essentially irrelevant for purposes of summary judgment.

But just as Rule 702 does not require direct proof of a specific defect, neither does the AEMLD. It is well-established that Rudd may make out a prima-facie claim of a fan-metal defect under the AEMLD without providing any direct proof of a specific defect.

From its earliest formulations, the AEMLD has been construed as allowing plaintiffs to show a product was defective or unreasonably dangerous despite a lack of direct evidence identifying a specific defect: "a defect is that which renders a product unreasonably dangerous, *i.e.,* not fit for its intended purpose.... [I]t makes no difference whether [the product] is dangerous by design or defect." *Casrell v. Altec Industries, Inc.,* 335 So.2d 128, 133 (Ala.1976) (internal citations and quotations omitted). "[P]roof of the specific defect, *i.e.,* the exact act, omission, process, construction, etc., resulting in the product's failing its intended use, is not required. 'If a product is unreasonably dangerous, it is necessarily defective, and the consumer should not be required to prove defectiveness as separate matter.'" *Sears, Roebuck & Co., Inc. v. Haven Hills Farm, Inc.,* 395 So.2d 991 (Ala.1981). While a prima-facie case is not established by a showing of the mere fact of consumer injury or product failure, "the Plaintiff has proved a prima facie case where the evidence raises a reasonable inference from which the fact finder may rationally conclude that plaintiff's injuries and damages resulted proximately from the product's failure of performance causally related to its defective condition." *Id.* at 995, 996; *see also Goree v. Winnebago Industries, Inc.,* 958 F.2d 1537, 1541 (11th Cir.1992) ("A[n] [AEMLD] plaintiff does not have to establish the specific defect that caused his injury, only that the product was unreasonably dangerous."); *Atkins v. American Motors Corp.,* 335 So.2d 134, 142 (Ala. 1976) (while the doctrine of "res ipsa loquitur" is inapplicable to a products-liability action under the AEMLD, a defective product constitutes "negligence per se", and can be defined simply as an "unrea- sonably dangerous" product without that definition being tautological).

More recent AEMLD cases, including the cases cited by GM, emphasize that a plaintiff must affirmatively come forward with some evidence to support an inference that the product had a defect (that is, a defect that was present at the time the product was sold by the defendant and one that is causally related to the plaintiff's injuries). But, in no way do these cases reverse course on the tradition that a plaintiff need not have evidence specifically identifying the exact nature of the defect. *See Taylor v. General Motors Corp.,* 707 So.2d 198, 201–202 (Ala.1997) (the mere fact that a car inexplicably ran off the road is insufficient to establish a defect under the AEMLD because, while the law does not require proof of a specific defect, the plaintiff must prove the existence of a defective condition and proximate cause); *Townsend v. General Motors Corp.,* 642 So.2d 411 (Ala.1994) (under the AEMLD, proof of a defect must be affirmatively shown, that is, mere proof of accident and injury is insufficient); *Jordan v. General Motors Corp.,* 581 So.2d 835 (Ala.1991) (while proof of a specific defect is not required, mere proof of an accident with resulting injuries is insufficient to establish AEMLD fault because "the plaintiff must affirmatively show that the product was sold with a defect or in a defective condition"); *Brooks v. Colonial Chevrolet– Buick, Inc.,* 579 So.2d 1328 (Ala.1991) (the plaintiffs did not establish a prima-facie case because they offered no expert and no evidence of a defect other than their alleged injuries and their belief that the car brakes must have been defective); *see also Hall v. General Motors Corp.,* 647 F.2d 175, 178–179 (D.C.Cir.1980) (under D.C. Circuit law, it is appropriate to instruct a jury that a manufacturer-defendant may be liable under a "general theory" of an obvious or unidentified hidden defect rather than a "specific theory" of a defect if the plaintiff presents "(1) evidence tending to negate causes for the accident other

than a defect in the car, and (2) evidence tending to show that the defendant-manufacturer introduced into the car whatever defect might have existed" even if the evidence negates only the most obvious causes, such as intoxication or excessive speed, unless the defendant offers specific accounts of how the accident might have happened in the absence of a defect in the automobile); *McFarlane v. Caterpillar, Inc.*, 974 F.2d 176 (D.C.Cir.1992) (in order to adduce evidence of a general defect under District of Columbia law, a plaintiff must show that it is more likely than not that the accident was caused by a mechanical defect attributable to the manufacturer, including, at a minimum, evidence that the plaintiff experienced some difficulty with the vehicle and evidence tending to negate other causes such as driver error); *Corcoran v. General Motors Corp.*, 81 F.Supp.2d 55 (D.D.C.2000); *Pappas v. Ford Motor Company*, 7 F.Supp.2d 22 (D.D.C.1998); *cf. Pouncey v. Ford Motor Company*, 464 F.2d 957, 958–961 (5th Cir.1972) (affirming a district-court pre-AEMLD Alabama-law tort verdict in favor of a plaintiff injured by the separation of a car radiator-fan blade—a plaintiff whose evidence consisted of expert-metallurgical testimony excluding a blade-deformation theory and supporting a metal-inclusions explanation—on the ground that a jury is free "to infer manufacturer negligence from circumstantial evidence where there is in the record direct evidence of an actual defect in the product"). Alabama caselaw then unambiguously allows Rudd to establish a prima-facie fan-defect claim under the AEMLD on the basis of evidence tending to exclude causes other than a manufacturing defect, and despite a lack of any direct evidence to identify a specific defect.

■ Rudd has, in fact, made out a prima-facie claim under the AEMLD, and one that—given GM's failure to offer rebuttal evidence—survives summary judgment. Rudd's evidence includes uncontradicted and admissible expert testimony opining that an imperceptible metal defect present at the time of manufacture must have been the cause of the fatigue-fracture and resulting accident because of the absence of the indicia of other possible causes, including evidence, such as Rudd's own testimony about his operation of the vehicle, that negates product misuse. A reasonable trier of fact could infer from Edmondson's and Rudd's uncontradicted testimony alone that the accident fan left GM's hands in a state that was unreasonably dangerous, causing injury to Rudd while he was engaged in a contemplated use of that product.

## C. *Rudd's Failure–to–Warn and Lack–of–a–Protective–Shield Claims under the AEMLD*

■ In addition to his defective fan-metal claim, Rudd attempts to assert GM's failure to adequately warn him of the danger of fan-blade separation and GM's failure to provide a protective shield for the fan, as distinct AEMLD claims. Against the latter two claims, GM relies again on a primarily negative strategy, arguing that Rudd has failed to establish his prima-facie case. This time, GM's strategy works. Rudd has not established a prima-facie case for allowing the protective-shield and failure-to-warn arguments to go forward as distinct AEMLD claims.

Issues such as adequate warning and lack-of-a-protective-shield commonly arise in the form of affirmative defenses in AEMLD cases. *See, e.g., Atkins v. American Motors Corp.*, 335 So.2d 134 (Ala. 1976). But when the AEMLD plaintiff is the party to raise these issues as distinct claims, he or she must at least satisfy the usual AEMLD standard, offering proof that the lack-of-adequate-warning or lack-of-a-protective-shield itself constitutes a defect, that is, a condition that was "unreasonably dangerous" for intended uses of the product. *See Townsend v. General Motors Corp.*, 642 So.2d 411 (Ala.1994); *Yarbrough v. Sears, Roebuck and Company*, 628 So.2d 478 (Ala.1993); *King v. S.R. Smith, Inc.*, 578 So.2d 1285 (Ala.1991);

*McCaleb v. Mackey Paint Manufacturing Co., Inc.,* 343 So.2d 511, 514 (1977) (the duty to warn under both AEMLD and common-law negligence theories applies only when such products are dangerous when put to their intended use). Furthermore, Rudd's lack-of-a-shield claim is essentially an alternative-design claim under the AEMLD, which, the Alabama Supreme Court has held requires proof that the plaintiff's injuries would have been reduced by the alternative design and proof that the utility of the alternative design (including styling and cost) would have outweighed the utility of the design actually employed. *See Townsend v. General Motors Corp.,* 642 So.2d 411, 418 (Ala. 1994). Yet, beyond the assertions in his briefs, Rudd has not provided any testimony or evidence, much less expert testimony, to suggest that it was unreasonably dangerous for GM not to provide a protective shield or not to warn more adequately of the dangers of fan-blade separation. Summary-judgment will be entered in favor of GM on these claims.

### D. *Merger of Rudd's Non-AEMLD Claims*

 Rudd alleges that GM's failure to equip the fan with a protective guard and GM's failure to provide adequate warning about the risk of fan-blade separation constitute not only AEMLD claims but also negligence under Alabama common law. Rudd's negligence claims, however, must be treated by this court as merged into his AEMLD claims. In a recent case, the Eleventh Circuit determined that negligence claims based on the same underlying allegations and theory as an AEMLD claim were merged into the latter as a matter of Alabama law. *See Spain v. Brown & Williamson Tobacco Corporation,* 230 F.3d 1300 (11th Cir.2000). The Eleventh Circuit held open the possibility that, in the future, at the Alabama Supreme Court's instruction, such negligence and AEMLD claims could turn out to be distinct from each other in their proof requirements. *See id.* (it is "prudent to set out our understanding of state law on these other points and invite the Alabama Supreme Court to correct our view on them if that view is wrong").[32] But unless and until that eventuality materializes, this court appropriately follows the Eleventh Circuit in treating Rudd's negligence claims as merged.

### IV. CONCLUSION

Accordingly, for the reasons above, it is ORDERED that defendant General Motors Corporation's motion for summary judgment, filed on October 10, 2000, is granted as to plaintiff Douglas Norman Rudd's AEMLD failure-to-warn and lack-of-a-protective-shield claims and his negligence claims and is denied in all other respects.

The clerk of the court is DIRECTED to provide a copy of this order to counsel for all parties by facsimile transmittal.

---

**32.** Anyway, if Rudd's negligence claims were to be treated to a different analysis than that accorded his AEMLD claims, this court believes the non-AEMLD claims would not survive summary judgment because Rudd made no effort to satisfy the requirements of the non-AEMLD negligence caselaw. For example, while Rudd has provided no evidence for his failure-to-warn claim, Alabama law insists that "A negligent-failure-to-adequately warn case cannot be submitted to a jury unless there is some evidence that the allegedly inadequate warning would have been read and heeded and would have kept the accident from occurring." *Gurley v. American Honda Motor Co.,* 505 So.2d 358, 361 (Ala.1987); *see also Yarbrough v. Sears, Roebuck and Company,* 628 So.2d 478, 482 (Ala.1993). And, for his lack-of-a-protective-shield claim, Rudd does not provide any "proof of the existence of a feasible, available alternative to the design presently used" nor "evidence to show that the utility of an alternative design outweighed the utility of the design actually used." *Id.* at 482.