Raymond E. LORD, Plaintiff,

v.

FAIRWAY ELECTRIC CORP., Gould, Inc., Siemens–Allis, Siemens Energy & Automation, Inc., Defendants.

No. 600CV842ORL28KRS.

United States District Court, M.D. Florida, Orlando Division.

July 1, 2002.

Daniel F. Dill, Luzardo Pendas, Rogers, Dowling & Coleman, P.A., Orlando, FL, for plaintiff.

Robert Littleton, Wilson, Elser, Moskowitz, Edelman & Dicker, P.A., New York City, Robert A. White, John W. Bussey, III and Associates, P.A., Orlando, FL, John W. Bussey, III, Bussey, White, McDonough and Freeman, P.A., Orlando, FL, for defendants.

## ORDER

ANTOON, District Judge.

On April 1, 1996, Plaintiff, Raymond Lord, a master electrician, was installing a breaker switch and load center for a customer. A "load center," sometimes called a panel box, is a metal panel box consisting, in part, of three copper electrical conductor "buses" individually referred to as "phases." The main circuit providing electricity to a building passes through the load center, to which "breaker switches"

are installed. Each phase has a "tab" narrower than the rest of the bus phases located at the top. Lugs are placed over the tabs into which worm screws are inserted to secure electrical wire in place. Another feature of the phases are "stabs" which are finger-like structures extending horizontally from the phases onto which the breaker switches are attached. The breaker switches, once attached to the stabs, allow branch circuits to be run from the main circuit. Both the breaker switch and load center were manufactured by Defendant Siemens Energy & Automation, Inc. (Siemens). As Plaintiff affixed the breaker switch to the stabs of the load center, an electrical arc struck him and he was seriously burned. Thereafter, Plaintiff filed this lawsuit alleging Siemens[1] was responsible for Plaintiff's injury.

The court has for consideration two motions—Plaintiff's Motion for Leave to File Second Amended Complaint to Conform to the Evidence (Doc. 58, filed March 12, 2002) and Siemens's Motion to Exclude Expert Opinion Evidence of Helmut Brosz (Doc. 67, filed April 22, 2002). For the reasons set forth below, Plaintiff's motion must be denied and Siemens's motion must be granted.

*I. Procedural and Factual Background*

On March 31, 2000, Plaintiff filed suit in Florida state court alleging that a defect in the Siemens circuit breaker caused the electrical arc that injured Plaintiff. After Siemens answered the original complaint, the case was removed to this court. In August 2000 Plaintiff filed his First Amended Complaint (Doc. 18) containing the same allegations of a defective breaker switch. Pursuant to the court's Amended

Case Management and Scheduling Order (Doc. 28, filed October 11, 2000), which was based on dates submitted by the parties in their Case Management Report (Doc. 20), all amendments to pleadings were required to be filed no later than November 20, 2000. The Amended Case Management and Scheduling Order also required disclosure of expert witness reports no later than November 5, 2001 for Plaintiff and January 7, 2002 for Defendant. In orders addressing Joint Motions for Enlargement of Time to File Expert Reports (Docs. 42 & 45, filed September 27, 2001 and December 6, 2001, respectively), the court extended the deadlines for disclosure of expert reports to February 28, 2002 for Plaintiff and to March 18, 2002 for Defendant. (Doc. 43, filed October 1, 2001 & Doc. 46, filed December 10, 2001).

The work of Plaintiff's expert, Mr. Helmut Brosz, is the focus of both motions pending before this court. Mr. Brosz is a professional (electrical) engineer who operates a forensic engineering firm in Markham, Ontario, Canada. Most of Mr. Brosz's professional work involves assisting parties engaged in litigation. In furtherance of his business Mr. Brosz actively pursues clients through personal contact. According to Mr. Brosz, he learned of Plaintiff's pending lawsuit claiming the Siemens breaker was defective through his "proprietary marketing source," although at his deposition he refused to disclose to opposing counsel the nature of this source. Upon receiving information regarding Plaintiff's lawsuit, Mr. Brosz telephoned Plaintiff's counsel on January 2, 2001 and offered his services as an expert witness. On January 29, 2001, after the deadline for

---

1. Plaintiff also filed suit against Defendants Fairway Electrical Corp. and Gould, Inc. Gould, Inc. was voluntarily dismissed on July 5, 2001. Plaintiff's wife, Mary Lord, was originally a plaintiff claiming loss of consortium, but her claims were voluntarily dismissed prior to the hearing on these motions. (Doc. 65, filed Apr. 17, 2002). Fairway Electric Corp. has not answered the Amended Complaint, and a default has been entered against Fairway (Doc. 75, filed May 6, 2002).

amendment of pleadings had passed, Plaintiff's counsel retained Mr. Brosz to work on this case.

On February 6, 2001, the week after he was retained, Mr. Brosz traveled to Florida to inspect the load center and circuit breaker. After inspecting the equipment, Mr. Brosz concluded that the theory of causation alleged in the Amended Complaint was invalid because the damage he observed was not caused by a defect in the circuit breaker. Despite making this discovery early on in his work, it is unclear from the record before this court whether Mr. Brosz ever advised Plaintiff's counsel that the circuit breaker was not defective prior to submission of his expert report over a year later.

On February 20, 2002, just eight days prior to the deadline for filing expert reports, Mr. Brosz conducted destructive disassembly insulation and function testing of the Siemens breaker switch. Pursuant to agreement of the parties, these destructive disassembly tests were conducted in the presence of Siemens's expert and other Siemens representatives. These tests conclusively established that the breaker switch was not defective. After the testing conducted in the presence of Siemens representatives, Mr. Brosz conducted additional disassembly tests in private.

On February 26, 2002, Plaintiff filed Mr. Brosz's expert report, for the first time suggesting that Plaintiff's injury was caused by a defective load center and not by the circuit breaker. In that report and in his subsequent deposition, Mr. Brosz provided his opinion regarding causation. The report revealed that upon his inspection of the tab of the A-phase bus of the load center, Mr. Brosz noticed a gouge on the edge of the tab which he believed had been created during the manufacturing process eight years prior to the accident. He opined that a sliver of copper had been created by the gouging and had remained lodged somewhere in the load center since manufacture. It is Mr. Brosz's opinion that, as Plaintiff was placing the circuit breaker in the load center, the sliver became dislodged and fell until it came to rest in contact with both the A- and C-copper phases of the load center. According to Mr. Brosz, once the phases were bridged by the sliver, the electrical current from the short circuit created ionized gases and, ultimately, the arcing which injured Plaintiff.

After the submission of Mr. Brosz's expert report, Plaintiff moved to file a Second Amended Complaint to allege that the defective load center rather then the circuit breaker was the proximate cause of Plaintiff's injuries. Siemens has objected to the proposed amendment and, under Rule 702, Federal Rules of Evidence and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 587, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), has moved to exclude Brosz's expert opinion testimony as unreliable.

## II. Discussion

### A. Plaintiff's Motion for Leave to File Second Amended Complaint to Conform to the Evidence (Doc. 58)

Approximately two weeks after Mr. Brosz submitted his expert report, Plaintiff filed his "Motion For Leave to File a Second Amended Complaint to Conform to the Evidence." In support of his motion to amend, Plaintiff relies primarily on Federal Rule of Civil Procedure 15(b), which provides that when parties expressly or impliedly consent to try issues, "[the issues] shall be treated as if they had been raised in the pleadings." At oral argument Plaintiff asserted in the alternative that the amendment should be permitted under Federal Rule of Civil Procedure 15(a) on grounds that the amendment would serve the ends of justice. Siemens opposes the motion for leave to amend,

arguing that Rule 15(b) is not applicable to the circumstances of this case and that Plaintiff has failed to meet his burden under Rule 15(a). Moreover, Siemens contends Rule 16(b) is controlling because the Case Management and Scheduling Order had already been entered and the deadline for amending pleadings had long expired by the time Plaintiff sought leave to amend. Under these circumstances, Siemens argues, in order to be entitled to amend Plaintiff must show "good cause" and that Plaintiff has acted with diligence—something the Plaintiff cannot do.

### i. Federal Rule of Civil Procedure 15(b)

 The proposed Second Amended Complaint attached to the motion alleges for the first time that Plaintiff's injury was caused by the defective load center, and Plaintiff asserts that this issue has been litigated by the implied consent of the parties. Plaintiff argues that the court should grant leave to amend because the parties have engaged in discovery regarding the load center along with discovery regarding the circuit breaker. Although the court is aware that destructive disassembly tests of the load center were performed in the presence of representatives from both sides just days before Plaintiff's expert report was due, the extent of discovery undertaken by the parties regarding whether the load center load center was defective is unclear. The extent of discovery and communications that had transpired between the parties on this point were not specified in Plaintiff's memorandum or at oral argument on the motion. Siemens insists that no discovery was directed to the issue of whether the load center was defective until after the destructive disassembly tests.

Regardless of the tests and discovery, Plaintiff is not entitled to relief under Rule 15(b) because this rule is not applicable to cases that have not yet proceeded to trial.

In relevant part, the rule provides: "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised by the pleadings." Fed.R.Civ.P. 15(b). Thus, 15(b) specifically applies only in those cases which have proceeded to trial; other cases are covered by Rule 15(a).

### ii. Federal Rule of Civil Procedure 15(a)

 Plaintiff also contends he is entitled to relief under Rule 15(a), Federal Rules of Civil Procedure. Rule 15(a) provides that "leave [to amend] shall be freely given when justice so requires." There is a liberal policy favoring allowance of amendments to pleadings. *Burger King Corp. v. Weaver,* 169 F.3d 1310, 1318 (11th Cir.1999). However, the right to amend is not absolute. *Thompson–El v. Jones,* 876 F.2d 66, 67 (8th Cir.1989). In deciding motions to amend courts should exercise discretion, considering factors "such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment." *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962). In the instant case there is no evidence of bad faith or dilatory motive on the part of the Plaintiff or his counsel. There are, however, questions regarding factors of undue delay, prejudice to Siemens, and futility of allowing the requested amendment. Consideration of these factors weighs against Plaintiff.

There have been long and inexplicable delays in the prosecution of this case from the beginning. Plaintiff's counsel agreed to take Plaintiff's case just before the statute of limitations ran. As a result of the

rush to file a complaint, counsel had little time to consult an expert witness to establish the cause of Plaintiff's injury. As Plaintiff's counsel explains, in drafting the original complaint he relied on his client's opinion that the circuit breaker was defective and the cause of the arcing. Plaintiff, however, fails to explain why he waited until January 2001—two months after the deadline for amendment of pleadings had passed—to employ an expert. Indeed, the court is left to wonder how much more time would have passed before Plaintiff retained an expert witness had Mr. Brosz not solicited Plaintiff's counsel. Even more alarming, however, is the delay apparently attributed to the lack of communication between Mr. Brosz and Plaintiff's counsel. According to Mr. Brosz's deposition testimony, he believed the circuit breaker was not the source of the problem from the time of his original inspection in February 2001, yet he did not reveal this discovery to Plaintiff's counsel until the filing of his expert report more than a year later.

In finding that there was undue delay in prosecuting this case the court acknowledges Plaintiff's argument that he did not know for certain that the load center was implicated until the destructive testing in February 2002, and, upon discovering the load center was the "smoking gun" he moved with diligence (within two weeks) to seek to amend the complaint. By the time the motion to amend was filed, however, final trial preparations should have been underway. At this point the granting of the motion to amend would result in further delay to allow Siemens to prepare to defend against the new theory of causation.

Plaintiff also points out that Siemens's expert was present at the February 2002 destructive disassembly testing and has prepared an expert report regarding the load center on behalf of Siemens and therefore, Plaintiff argues, Siemens will not be prejudiced by allowing the requested amendment. However, Siemens insists that it is not prepared to go forward on the newly asserted theory of causation and that a continuance of the trial set since October 2000 would be necessary if the amendment were allowed.

The court has considered prejudice likely to be suffered by Siemens should the court grant the late motion to amend. The thrust of Siemens's argument that allowing the Second Amended Complaint to be filed will result in undue prejudice is that Siemens has expended time and resources defending allegations that it was the circuit breaker rather than the load center that was defective. These resources were wasted because Plaintiff delayed its employment of an expert and because Mr. Brosz, once retained, failed to tell Plaintiff's counsel that the original theory alleged was erroneous. It was this erroneous theory that was researched, mediated, and addressed in discovery. The granting of Plaintiff's motion would result in the expenditure of yet additional resources.

The final factor to be considered under *Foman* is whether the amendment, if allowed, would be futile. In cases cited by Siemens the amendments would have been futile because the amended complaints would not have withstood motions to dismiss. *See Humphreys v. Roche Biomedical Labs., Inc.,* 990 F.2d 1078, 1082 (8th Cir.1993) (affirming denial of motion to amend complaint after complaint already dismissed); *Massarsky v. Gen. Motors Corp.,* 706 F.2d 111 (3d Cir.1983) (affirming denial of motion to amend complaint to include a cause of action that was time-barred); *Mahon v. City of Largo, Florida,* 829 F.Supp. 377 (M.D.Fla.1993) (denying motion to amend to include claim for punitive damages without proper statutory predicate). Similarly, this court finds that

allowing the complaint to be amended as proposed would be futile.

Unlike the cases cited above, Siemens's claim of futility is not based upon an amended complaint's inability to survive a motion to dismiss. Instead, Siemens claims the amendment would be futile because Mr. Brosz's expert testimony does not pass scrutiny under *Daubert* and Rule 702 of the Federal Rules of Evidence. In other words, as a result of the *Daubert* ruling set forth later in this order, there is no expert testimony to support the theory of causation contained in the proposed Second Amended Complaint. This court agrees that without an expert opinion that the load center was defective and caused the arcing, Plaintiff has failed to demonstrate that there is a factual basis for the amendment and therefore the proposed amendment would be futile.

### iii. Federal Rule of Civil Procedure 16

Rule 16 of the Federal Rules of Civil Procedure pertaining to case management and scheduling is also a basis for denying Plaintiff's motion to amend his complaint. The Eleventh Circuit's decision in *Sosa v. Airprint Systems, Inc.*, 133 F.3d 1417 (11th Cir.1998), is instructive as to how Rule 16 is applied to amendments outside the time frame established in the court's case management and scheduling orders. Once the district court has entered a scheduling order limiting the time for amendments to pleadings as required by Rule 16(b) the schedule set by the court will control the course of the action unless the schedule is later modified by court order "upon a showing of good cause." Fed.R.Civ.P. 16(b). "This good cause standard precludes modification unless the schedule cannot 'be met despite the diligence of the party seeking the extension.'" *Sosa*, 133 F.3d at 1418 (quoting Fed. R.Civ.P. 16 advisory committee's note). A finding of lack of diligence on the part of the party seeking modification ends the good cause inquiry, *see id.*, and the record in this case reveals a serious lack of diligence on the part of Plaintiff.

In *Sosa*, the court considered three factors in assessing diligence exercised in meeting the deadline set in the scheduling order for amending the complaint: 1) the plaintiff failed to ascertain facts prior to filing the complaint and to acquire information during the discovery period; 2) the information supporting the proposed amendment was available to the plaintiff; and 3) even after acquiring information, the plaintiff delayed in asking for amendment. Application of this same analysis to the facts of this case proves fatal to Plaintiff's motion to amend his complaint. For instance, Plaintiff waited until the deadline for amending his pleadings had expired to hire his expert witness, who has now provided him with the factual basis for his proposed amendment. Plaintiff also delayed more than a year in obtaining an opinion from his expert as to the causation of the short circuiting that gave rise to the arcing that injured Plaintiff. The severity of Plaintiff's lack of diligence could have been mitigated had the court and Siemens been given notice upon Mr. Brosz reaching the conclusion that the circuit breaker was not defective. For reasons not disclosed, however, Mr. Brosz either did not share this information with Plaintiff's counsel, or he did share the information and counsel did nothing until after Mr. Brosz filed his expert report more than a year later. Under these facts, the court cannot find that there was diligence on the part of Plaintiff, and therefore the good cause inquiry must terminate.

Of course, it is desirable for all cases to be resolved on their merits with all relevant information available to the trier of fact. On the other hand, it is also necessary for courts to maintain control of their cases and integrity in their dockets. To

this end, soon after cases are filed, courts enter case management and scheduling orders allowing the parties to rely on a schedule for preparation, discovery, amendments to pleadings, and dispositive motions. Absent a showing of diligence on the part of a party seeking to extend deadlines contained in the scheduling order, the court-ordered schedule should not be disturbed.

### iv. Conclusion

Plaintiff has failed to establish a well-founded basis in support of his Motion for Leave to File Second Amended Complaint to Conform to Evidence. The motion must therefore be denied.

### B. Siemens's Motion to Exclude Expert Opinion of Helmut Brosz (Doc. 67)

The admissibility of expert opinion testimony is governed by the Federal Rules of Evidence. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 587, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). In applying these Rules to expert testimony, it is the responsibility of the trial court to serve as a "gatekeeper," screening scientific testimony to ensure that it is relevant and reliable before it is presented to the trier of fact. *Id.* at 589, 113 S.Ct. 2786. Following the *Daubert* decision, Rule 702 of the Federal Rules of Evidence was amended to emphasize the trial court's "gatekeeper" role and to provide standards for the trial court to apply in determining reliability. Rule 702 provides that an expert may give opinion testimony only "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case."

The primary focus of *Daubert* was on the methodology applied by the expert in arriving at an opinion. This concern is now addressed in the second requirement of Rule 702. The *Daubert* court provided a nonexclusive list of factors to be considered in making assessments of proffered scientific testimony and in determining whether the opinion is "ground[ed] in the methods and procedures of science." *Daubert*, 509 U.S. at 590, 113 S.Ct. 2786. The list includes the following considerations: the testability of theory, publication and peer review, assessment of the known or potential error rate, and general acceptance of the theory in the relevant scientific community. *Daubert*, 509 U.S. at 593–94, 113 S.Ct. 2786. This list, however, is not intended to be a "definitive checklist" and should not impinge on flexible inquiry by the trial judge in evaluating the reliability of expert testimony. *Daubert*, 509 U.S. at 593, 113 S.Ct. 2786. "Consistent with this understanding, the advisory committee notes to Rule 702 explain that the 2000 amendment, while intended as an endorsement of the *Daubert* conception of the trial judge as a gatekeeper, was not intended to codify the specific factors mentioned in *Daubert*." *Rudd v. Gen. Motors Corp.*, 127 F.Supp.2d 1330, 1335 (M.D.Ala.2001).

If there were any remaining doubts to the contrary, in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), the United States Supreme Court made it clear that the trial court's "gatekeeping" responsibilities apply not only to testimony based on scientific knowledge, but also extend to testimony based on technical or specialized knowledge, including engineering. *Kumho*, 526 U.S. at 141, 119 S.Ct. 1167. Experts "relying solely or primarily on experience ... must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is

reliably applied to the facts." Fed.R.Evid. 702 advisory committee's note. Flexibility is essential in assessing the reliability of such expert testimony. In keeping with a tailored and flexible approach in assessing the testimony, the *Daubert* factors, as well as others, may be considered. *Kumho*, 526 U.S. at 150, 119 S.Ct. 1167. Similarly, not all *Daubert* factors will necessarily be applicable in every case. *Kumho*, 526 U.S. at 151, 119 S.Ct. 1167. Ultimately, the factors to be considered in assessing reliability will depend on the "particular circumstances of the particular case at issue." *Kumho*, 526 U.S. at 150, 119 S.Ct. 1167. Whatever factors are considered, it is the court's responsibility "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho*, 526 U.S. at 152, 119 S.Ct. 1167.

 In carrying out their "gatekeeping" obligation, trial courts should keep in mind three important principles. First, the "gatekeeping" function is intended to counterbalance the latitude of Rule 702's allowing an expert to express an opinion, which is, after all, "a relaxation of the usual requirement of first hand knowledge" of the facts about which a witness testifies. *Rudd*, 127 F.Supp.2d at 1335. Obligatory judicial screening of expert testimony for relevance and reliability is not intended to usurp the role of the jury as finder of fact. *Allison v. McGhan*, 184 F.3d 1300, 1311 (11th Cir.1999). Indeed, conscientious application of this rule should result in the exclusion of expert testimony being the exception rather than the rule. *See* Fed.R.Evid. 702 advisory committee's note. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction of the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596, 113 S.Ct. 2786. Second, "nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). Finally, it is the proponent of expert opinion testimony who bears the burden of establishing its admissibility by a preponderance of the evidence. *See Bourjaily v. United States*, 483 U.S. 171, 172–73, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987), *cited in Daubert*, 509 U.S. at 592 n. 10, 113 S.Ct. 2786. This does not mean, however, that the proponent must prove the expert testimony is scientifically correct, but only that it is reliable. Fed.R.Evid. 702 advisory committee's note.

As previously noted, Helmet Brosz is an electrical engineer. In arriving at his opinion regarding causation, he purports to rely on engineering science as well as his knowledge and experience as an engineer. Regardless of the precise nature of the proffered expert opinion testimony, it is subject to the court's scrutiny with regard to reliability. Thus, it is necessary to assess the opinion testimony offered by Mr. Brosz, using criteria particular to this case and applying the above-described principles.

Siemens argues that the court should consider three of the factors discussed in *Daubert* in assessing Mr. Brosz's opinion as to causation of Mr. Lord's injury: 1) whether Mr. Brosz's testimony is based upon sufficient facts; 2) whether his testimony is the product of reliable principles and methods; and 3) whether the premises underlying his testimony have been documented and tested. Siemens also encourages the court to consider other factors relevant to this particular case, including: 1) whether Mr. Brosz's opinion takes alter-

native explanations into account; 2) whether Mr. Brosz's opinions are supported by articles or papers; 3) whether Mr. Brosz has made improper extrapolations from data; and 4) whether Mr. Brosz's methodology was influenced by litigation. Finally, Siemens asks the court to consider whether Mr. Brosz's opinion is based on his *ipse dixit*. Analysis of these factors does not weigh in favor of the reliability of Mr. Brosz's testimony.

The premises upon which Mr. Brosz bases his opinion are not based upon sufficient facts and do not withstand scrutiny for reliability. When questioned about his theory of causation, Mr. Brosz admitted that he had found no sliver of copper or other metal during his inspection of the equipment. He based his conclusion that such sliver had been present in the load center on his observation of a "score" or "gouge" in a tab of the A-phase bus. In Mr. Brosz's opinion, the gouge was created by the insertion of a lug onto the A-phase tab. Mr. Brosz's estimate as to the length of the sliver has varied during the course of litigation but he seems to have settled on a length of .785." Although he considered the length of the phantom sliver important, Mr. Brosz never attempted to ascertain the diameter or volume of the sliver he believes was created. It is Mr. Brosz's contention that the sliver was present in the load center at the time of Plaintiff's injury. He asserts that the sliver became dislodged as Plaintiff attempted to install the load center and that once dislodged, the sliver came into contact with the lower portion of the A-phase bus and a vertical section of the C-phase bus, causing a short circuit. Mr. Brosz stated that this was the point at which he believed the sliver bridged the A- and C-phase buses because the distance between these two points is approximately the same or slightly smaller than the "score" on the A-phase state tab—.785." Once the bridge was allegedly formed the current ionized the gases, creating the arc that injured Plaintiff.

Mr. Brosz also offered an opinion as to why the sliver became dislodged during Plaintiff's assembly. Mr. Brosz stated that Plaintiff was having difficulty installing the circuit breaker because the stabs were not properly aligned. According to Mr. Brosz, the additional pressure applied by Plaintiff in effort to seat the breaker switch caused the sliver to become dislodged. When asked to describe the force required to dislodge the sliver, Mr. Brosz was unable to quantify the force, saying "you'll have to ask Mr. Lord."

### i. The expert's first premise

 Perhaps most troubling is Mr. Brosz's first premise—that a copper sliver was created as a result of installation of inverted inserts over the tab on the A-phase of the load center during manufacturing. In his report, Mr. Brosz described an assembly machine forcing the lugs and inserts over the tabs despite reduced clearance, thereby creating the gouge. Emphasizing his opinion regarding the pressure required to create the gouge, Mr. Brosz stated that this assembly "takes a tremendous amount of force" and "can only be done by machine at the factory." He unequivocally stated that because of the reduced clearance, the lugs and inserts could not be manually installed onto the tabs. Siemens maintains that the inserts were installed as designed and were not inverted. Mr. Brosz insists, however, that the inserts were inverted in the Siemens's design. Regardless of the correctness of the positioning of the inserts, Mr. Brosz theorizes that the installation caused the gouge and therefore created the sliver that ultimately caused the electrical short.

At oral argument, Plaintiff's counsel suggested that the applicable standards be relaxed in assessing Mr. Brosz's testimony

because he was relying, solely or partially, on his experience as an electrical engineer. It is, of course, permissible for Mr. Brosz to rely on specialized knowledge and experience in giving testimony, but such testimony is subject to the trial court's scrutiny for reliability just as is science-based expert testimony. To the extent Mr. Brosz relies on his experience, his testimony is fatally flawed because he fails to explain what experience he relies upon. He does not state that he has had any experience that relates to the creation or shape of metal slivers in the manufacture of load centers or in any other process.

An analysis of this premise must begin with an inventory of the facts upon which it is based. Although the gouge described by Mr. Brosz is plainly visible on the copper tab, there is no direct evidence that a copper sliver ever existed, nor is there any evidence that slivers were created in the manufacturing process of other Siemens load centers. Moreover, there is no evidence that Siemens installed the lugs and inserts by machine. In fact, there is unrefuted evidence to the contrary establishing that they were manually installed. In a subsequent affidavit Mr. Brosz concedes that the lugs and inserts were manually installed without any explanation of the error in his report.

Not only was there no firsthand observation of a copper sliver, there are no principles or methods advanced by Plaintiff that would support the existence of a copper sliver. Additionally, no principles or methods are advanced supporting Mr. Brosz's opinion as to the shape of the sliver—that it was straight. This is important because the sliver would have to be almost perfectly straight to bridge the A- and Cphases of the load center bus at the narrowest point. Moreover, no explanation is given as to why the questions of the creation and shape of a sliver could not have been subjected to testing by replicating the manufacturing process Mr. Brosz described. Indeed, there are no test results or other empirical evidence before this court indicating that more likely than not the straight copper sliver described by Mr. Brosz ever existed.

Siemens contends that other factors also weigh against a finding of reliability of Mr. Brosz's first premise. For instance, neither Plaintiff nor Mr. Brosz has offered publications of any kind or peer review in support of Mr. Brosz's conclusions regarding the creation of the sliver. Because the burden of establishing reliability is on Plaintiff, the court must assume that no such supporting data exists. In assessing this factor the court is mindful that not all expert testimony will be the subject of peer review and publications. *See Kumho,* 526 U.S. at 151, 119 S.Ct. 1167. Indeed, it is unlikely that the question of whether slivers of copper were created in the Siemens manufacturing process was ever the subject of peer review or publication. Nevertheless, Mr. Brosz's assumptions regarding whether copper slivers would result when the metal was placed under pressure as he described may have been the subject of prior scientific study or testing. In sum, no authority was provided in support of Mr. Brosz's opinion regarding the creation of a copper sliver.

Also, Siemens argues that Mr. Brosz has made improper extrapolations from data— the data being the gouged tab and the extrapolation being that a straight copper sliver resulted which closed the electrical circuit, which in turn caused the arc, which in turn injured Plaintiff. The court agrees that these stacked and tenuous inferences do not weigh in favor of reliability.

Siemens criticizes Mr. Brosz's failure to take into account alternative explanations as to the cause of the short circuit; however, this criticism is not totally valid. Mr. Brosz did address the possibility that the

short circuit was created by a metal tool in Mr. Lord's hand at the time he installed the circuit breaker. Mr. Brosz explained that he accepted Mr. Lord's word that he did not have a tool. While Mr. Lord's explanation of the events leading up to the accident are self-serving, this court does not fault Mr. Brosz for relying on Mr. Lord's account of the facts in arriving at his opinion. Nonetheless, Mr. Brosz's discussion of other possible causes for the accident was not a deductive exercise resulting in a reliable conclusion that the sliver was the only possible cause. In the end, this factor neither enhances nor diminishes the reliability of the expert opinion.

Finally, Siemens suggests that Mr. Brosz's testimony was influenced by litigation. Various factors support such a conclusion, including the means by which Mr. Brosz became employed as Plaintiff's expert. Apparently Mr. Brosz, through a "proprietary source," searches the nation for lawsuits in which electrical systems or components are alleged to be defective. Mr. Brosz refused to discuss how this proprietary source works, so it is unclear whether it screens cases or merely reports the filings to Mr. Brosz. At any rate, when Mr. Brosz learned about this case he called Plaintiff's counsel and suggested to counsel that he be hired as Plaintiff's expert witness. Upon being retained, Mr. Brosz promptly inspected the equipment in Plaintiff's possession and immediately concluded that the circuit breaker was not defective as alleged in the Amended Complaint.

As noted above, the case proceeded for in excess of one year before it was disclosed that the theory of causation alleged in the Amended Complaint was incorrect. Even after the destructive disassembly of the panel box observed by both parties and their experts, the theory of causation remained unchanged. It was not until Mr.

Brosz conducted his own private disassembly of the load center just days before the deadline for his report that he arrived at his theory that the stabs were loose and improperly aligned. This last-minute inspection, which was not video-recorded, included further destructive testing; Mr. Brosz removed a plastic barrier which held the bus secure by the use of circular pins. After the pins were removed, the phases could be moved. It was in this unsecured position that Mr. Brosz measured the gaps between the A- and C-phases and concluded that it was sufficiently narrow to be bridged by a .785″ sliver. However, he made no measurement of the gaps when the phase was secured to the barrier as it was at the time of the accident.

To be sure, Mr. Brosz's conduct in this case has caused this court pause. From the manner in which he recruited Plaintiff's counsel to hire him, to his private tests of the equipment outside the presence of Siemens's representatives, to his last-minute conception of a theory of causation, his approach to this case has been unconventional to say the least. Because of these factors—especially the eleventh-hour theory of causation—Siemens insists Mr. Brosz's testimony was litigation-driven and therefore unreliable. While these factors have provided Siemens with ammunition to attack Mr. Brosz's credibility and argue to a jury that his testimony is entitled to little weight, this court cannot conclude based on the record before it that Mr. Brosz ignored facts that would support a more credible theory of causation. Therefore, the court does not conclude Mr. Brosz's testimony was litigation-driven to the point that it should be excluded solely on that ground. Nevertheless, as discussed above, the lack of support for this first premise is sufficient for this court, in exercising its "gatekeeper" function under *Daubert*, to conclude that Mr. Brosz's testimony shall be excluded.

### ii. The expert's second premise

██ Although the court's conclusion as to Mr. Brosz's first premise is a sufficient basis for the granting of Siemens's motion, the court will nevertheless address the other two premises set forth by Plaintiff's expert. Mr. Brosz's second major premise is that the copper sliver was sufficient in size to have created ionization of gases resulting in arcing electricity. Overlooking, for the sake of argument, the fact that there is no direct evidence that a sliver ever existed, Mr. Brosz cannot tell us the diameter or volume of the sliver. This data is significant because the quantity of copper required to create an arc before it burns up is subject to testing. Common sense would dictate that the size of the sliver could not exceed the volume of the gouge, but Mr. Brosz failed to take that measurement. Without providing any support for his conclusion, Mr. Brosz states that any amount of copper, no matter how small, could cause arcing when subjected to the current running through the load center. At a minimum, Mr. Brosz should have provided accepted principles or publications to support his opinion that the alleged sliver was of sufficient size to create the arcing, but he failed to do so. Interestingly, Siemens's expert conducted tests to determine the amount of copper it would take to create arcing, concluding that it would require a piece of copper five times the size of the gouge. For purposes of resolving the motion to exclude Mr. Brosz's testimony, the court does not assume Siemens's test to be accurate, but the court is troubled by the fact that Mr. Brosz did not conduct tests or provide standards or literature to support his theory that the copper sliver was of sufficient size to have ionized enough gas to create the arcing that occurred in this case.

The Plaintiff has also failed to establish that Mr. Brosz's experience qualifies him to testify as to this premise. With regard to other factors for consideration suggested by Siemens, including whether Mr. Brosz considered alternative explanations, whether Mr. Brosz's testimony was litigation-driven, and whether Mr. Brosz made improper extrapolations, the court reaches the same result as it did with regard to Mr. Brosz's first premise.

### iii. The expert's third premise

██ According to Mr. Brosz, the additional pressure applied by Plaintiff in effort to seat the breaker switch caused the sliver to become dislodged. There is no science offered in support of this conclusion. When asked to describe the force required to dislodge the sliver, Mr. Brosz was unable to quantify the force because he does not know where the sliver was prior to its falling into the load center. In his effort to describe the force, he referred to it as "unique," "a different kind of force," and "a lot more force than was necessary," but when pressed to quantify the force he stated, "You'll have to ask Mr. Lord, but he tells me he needed a lot more force than was usually necessary." Mr. Lord actually described the force as causing "a little bit of difficulty, not a whole lot."

Mr. Brosz attempts to support his view that great force was applied to the breaker switch as Plaintiff attempted to install by the observations he made of the panel during his private inspection. After disconnecting the bus from the plastic barrier, he noticed that there was up and down movement in the B-phase bus. With the equipment in this condition he also noticed that the stabs were not evenly aligned. Relying on this information, Mr. Brosz then concluded that it was this misalignment of the stabs that caused resistance as Plaintiff attempted to install the breaker. Unfortunately, no data was recorded establishing that the stabs were improperly

aligned before Mr. Brosz took the load center apart after the Siemens representatives left at the conclusion of the scheduled destructive testing.

This opinion is based not upon science but upon the experience of Mr. Brosz, as was the case with other premises advanced by Mr. Brosz. Again, this premise is not based upon sufficient facts or data, and the testimony is not the product of reliable principles. Mr. Brosz has failed to establish that his experience renders his testimony reliable.

### iv. Conclusion

In summary, there is no challenge to Mr. Brosz's qualifications as an electrical engineer who has worked on product liability cases stemming from defective equipment. Nonetheless, Plaintiff has failed to carry his burden of establishing the reliability of Mr. Brosz's expert opinion testimony. Mr. Brosz's testimony as to the causation of Plaintiff's accident is connected to existing data only by his *ipse dixit* and must be excluded.

### III. Conclusion

For the foregoing reasons, it is hereby **ORDERED**:

1. Plaintiff's Motion For Leave to File Second Amended Complaint to Conform to the Evidence (Doc. 58) is **DENIED**.

2. Siemens's Motion to Exclude Expert Opinion Evidence of Helmut Brosz (Doc. 67) is **GRANTED**.